Filed 9/24/13  Yang v. Regents CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| ANNA YANG,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | D062755<br><br><br><br>(Super. Ct. No. 37-2012-00090268) |

APPEAL from a judgment of the Superior Court of San Diego County, William S. Dato, Judge.  Affirmed.


Law Offices of Jose A. Gonzales and Jose A. Gonzales for Plaintiff and Appellant.

Charles F. Robinson, Karen J. Petrulakis, Margaret L. Wu and Sunil R. Kulkarni for Defendant and Respondent.

Plaintiff Anna Yang was a pharmacy student at the Skaggs School of Pharmacy and Pharmaceutical Science (the School) at the University of California, San Diego (UCSD). She failed four courses during the five years she attended the School. In 2011 she failed two Advanced Pharmacy Practice Experiences (APPEs), which are similar to clinical rotations. By failing two APPEs in the same year, Yang was subject to dismissal under the School's policies.

The School's Academic Oversight Committee (Committee), a group of faculty who ensure that students meet the School's academic standards, held a hearing where they reviewed Yang's academic record, and listened to her explanations. At the end of the hearing the Committee decided to dismiss Yang from the School because of her poor academic performance. The Committee also based its decision on comments by several instructors that Yang's substandard performance compromised patient safety.

After losing an internal appeal, Yang brought a petition for writ of mandate (petition) in the San Diego County Superior Court against defendant Regents of the University of California (University), seeking to overturn the Committee's findings and reinstate her to the School. The court denied Yang's petition, finding the Committee did not err in dismissing her based on her poor academic performance.

On appeal, Yang asserts (1) the School did not document her academic performance issues with a "Professional Evaluation Form," or "PEF"; and (2) her dismissal was unlawful because the school did not comply with its clinical course grade remediation policies. The Regents in turn argue Yang's appeal is untimely as she did not

2

appeal from the order denying her petition but instead appealed from a later notice of entry of judgment. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Classroom and APPE History*.

In February 2002 Yang arrived in the United States after receiving a Bachelor of Arts degree in business from Sichuan University in China. Beginning in April 2002 Yang attended the California Polytechnic State University in Pomona, and in 2006 she earned a Bachelor of Science with a major in microbiology and a minor in chemistry. In May 2006 Yang was admitted to the School.

Yang was a student at the School from fall 2006 through November 2011. Her academic record for the classroom/didactic phase of the curriculum included two failing grades. Because Yang remediated these grades, however, the School permitted Yang to progress to the clinical rotation phase of the curriculum, which began in the winter quarter of the 2010-2011 academic year.

This phase of the program requires a student to pass seven APPEs, consisting of four required rotations and three elective rotations. The four required APPEs are two acute care rotations and two ambulatory care rotations. A student can only take one APPE at a time, with each APPE lasting approximately six weeks.

The School's progression policy applicable to APPEs provides: "If a student receives an F or U grade for a specific APPE, he/she will be allowed to continue their remaining, scheduled APPEs. *Upon completion of the last scheduled APPE*, the

3

student *will* repeat and pass the APPE where an F or U grade was received or complete and pass an equivalent APPE experience." (Italics added.) Accordingly, a student may only repeat and pass a failed APPE, or complete and pass an equivalent APPE, after the student finishes all other remaining scheduled APPEs.

According to the School, this policy is in place because scheduling APPEs is a complex, difficult task for the School. APPEs are available at over 100 clinical locations, and over 150 instructors supervise APPEs. Each student has a unique APPE schedule. Therefore, the School schedules all seven of a student's APPEs even before a student has started his or her first APPE. The School concluded that it would be disruptive to that student's schedule, other students' schedules, the clinical sites, and APPE instructors to require immediate remediation of a failed APPE.

Yang failed an acute care APPE at Scripps La Jolla Hospital in the spring of 2011. Because this was her first failed APPE, the School allowed her to remain in the School and continue taking her scheduled APPEs, with the understanding that she would remediate her failed acute care APPE at the end of her scheduled APPEs. Yang then failed an ambulatory care APPE at UCSD Moores Cancer Center in September 2011.

B. *The Committee Hearing and Yang's Internal Appeal*

"When the possibility of dismissal is determined, [t]he [Committee] will be convened to determine dismissal or retention of the student." The Committee is composed of faculty members and is "concerned with the academic performance of students." The Committee ensures that students are progressing appropriately through the School curriculum and that graduates of the School are ready to practice pharmacy

4

accurately, safely, and with professionalism. In making this determination, the Committee considers a student's entire academic history in the preclinical and clinical arenas.

At Committee hearings addressing potential dismissal, the Associate Dean for Student Affairs presents to the Committee all evidence that "led to the possibility of the dismissal of the student." That evidence includes a student's complete academic file. The student, who is provided before the hearing with all information the Committee has, then has a chance to respond, if he or she chooses to do so. Thereafter the Committee meets in closed session to determine whether dismissal is warranted. A vote for dismissal must be based solely upon the evidence presented at the hearing and be approved by at least two-thirds of the Committee members present.

As discussed, *ante*, after Yang failed her second APPE in the same year, she was subject to dismissal. The School held a Committee hearing on November 9, 2011 to consider her dismissal. At the hearing, Dr. Candis Morello, Associate Dean for Student Affairs, presented information relating to Yang's performance at the School. Dr. Morello informed the Committee about Yang's academic deficiencies, including the two recent failed APPEs and the two past failed classroom courses.

One aspect of academic performance for a pharmacist is ensuring patient safety. Dr. Morello presented to the Committee evidence concerning Yang's conduct that was potentially endangering patients. As an example, one APPE instructor stated that Yang could not calculate correct doses of various medications and "frequently confused medications." Another APPE instructor stated that "[w]e hesitated in allowing Anna

5

opportunities to counsel and question complex patients based on her lack of clinical and critical thinking."

Dr. Morello also detailed Yang's professionalism issues as documented by her APPE instructors, including Yang's rudeness and combativeness, tardiness to rotations, and failure to take responsibility for her actions.

After Yang presented her side of the story to the Committee, the Committee had "considerable discussion." Following that discussion, the Committee unanimously voted in favor of her dismissal, giving several reasons for its decision. Most of the reasons listed by the Committee were academic, including: (1) "A history and pattern of poor academic performance in the first three years of the curriculum as well as two failures during the [APPE] in core acute patient care and ambulatory care rotations"; (2) "A fundamental lack of clinical and medication knowledge leading to the concern for patient safety. [The School] has an obligation to ensure competence of our trainees and graduates"; and (3) "Lack of recognition of her own weaknesses and the importance of her knowledge gaps and mistakes that could lead to serious patient harm."

The School formally dismissed Yang in November 2011. In the dismissal letter, the School stated, "The main reasons for this decision of dismissal included a history and pattern of poor academic performance, in the first three years of the curriculum as well as two failures during the [APPE], a fundamental lack of clinical and medication knowledge leading to the concern for patient safety, and a lack of professionalism. [The School] has an obligation to ensure competence of our trainees and graduates."

6

Yang then appealed internally. She submitted additional evidence to Palmer Taylor, Ph.D., Dean of the School, and personally met with Dean Taylor. After considering the evidence before him, in December 2011 Dean Taylor upheld the Committee's dismissal decision. In doing so, he stated "I do not see grounds for reversing that decision based on my review of your academic record and the input of faculty who have instructed you in preclinical courses and advanced practice experiences." Under School policy, his decision was final.

Kim Barrett, Ph.D., Dean of Graduate Studies at the University, also confirmed the dismissal decision. In upholding the dismissal decision Barrett stated, "I find that your dismissal was decided on purely academic grounds and thus I have no ability to overturn it. There were persistent academic concerns including, but not limited to, your professionalism that, in aggregate, led to the conclusion that you had not attained the standard necessary to continue as a student. Further, while you imply that non-academic factors were used to assign grades, you have previously raised these issues with the School and they have been investigated thoroughly by Associate Dean Morello. She found no evidence that criteria other than academic ones were used to assign failing grades during your clinical rotations, and I concur with that assessment."

With regard to Yang's complaint that she was not provided with a PEF, Barrett stated, "I recognize your complaint that a professionalism evaluation form (PEF) was not completed. However, I am informed that the PEF is not mandatory and that it is a relatively new procedure and so some faculty are not yet aware of the process. I do not believe that the completion of this form would have changed circumstances materially,

7

since you were directly informed of professionalism concerns on your written evaluations and also, for example, being required to complete a time-sheet and sign in and out at your clinical placements due to your frequent tardiness.  Moreover, in that the grounds for your dismissal were academic, in part based on your poor knowledge of common drugs and their indications as well as other fundamental aspects of knowledge required for pharmacy practice, it is unlikely that any changes in behavior that hypothetically might have resulted from the PEF process would have altered the outcome."

C.  *Feedback Given to Yang Regarding Her Professionalism Issues*

All students at the School must "demonstrate professionalism as part of the requisite clinical competency."  Professionalism problems can include such items as tardiness to clinical rotations, lack of respect for patient confidentiality or autonomy, abusing one's power with colleagues or patients, rudeness, not responding to instructor feedback, and lacking empathy for patients.

When a student is having professionalism issues, the School seeks to point out those issues to the student and help the student remedy them.  An instructor who has observed the offending behavior will discuss that behavior with the student, document the behavior in writing, and discuss with the student potential remedies.  An instructor also may choose to document professionalism issues on the School's "Professional Evaluation Form" (PEF).  However, according to the School, use of the PEF is optional.  As long as the student is adequately informed of these professionalism issues and is given a remediation plan, the School does not require that this particular document be used.

8

Dr. Joe Ma, one of Yang's instructors during an APPE, provided handwritten comments to Yang in August 2011 on her self-assessment mid-point evaluation. Dr. Ma provided Yang with specific goals concerning professionalism and academic improvement. He also discussed his concerns with Yang directly, in accordance with the School's practice to hold mid-point APPE evaluations with students in person.

D. *Petition and Court's Ruling*

Yang filed her original petition in January 2012 and filed an amended petition in February 2012. After the University answered in May 2012, and the administrative record was lodged, the parties filed their briefs.

On June 20, 2012, the court issued a tentative ruling finding in the University's favor on all of Yang's claims. After oral argument on June 21, 2012, the trial court confirmed the ruling in open court and later issued a formal minute order, which duplicated its tentative ruling. In its minute order, the court found that the PEF "is directed at assisting students with professional behavior issues." The trial court also found that the PEF is limited to documenting professionalism issues and thus is not geared toward addressing academic performance problems. Finding that "the record contains ample evidentiary support for the School's decision to dismiss [Yang] based on her academic performance alone," the court held that "Yang has failed to establish that the School acted arbitrarily, capriciously or in bad faith when it dismissed her without issuing a PEF."

9

The court also found that "contrary to Yang's argument, the APPE progression policy precluded her from formally remediating her failed grade until she had completed all seven of her clinicals [i.e., APPEs]." The trial court further found that the School's policies "establish that Yang was subject to dismissal once she received two failing grades [in one year], regardless of whether they were remediated."

On June 22, 2012, the University served Yang with a "Notice of Entry" of the tentative ruling. The University thereafter prepared a formal judgment. The court entered the judgment on August 8, 2012, and on August 15, the University served Yang with a notice of entry of the judgment. Yang filed her Notice of Appeal on October 1.

DISCUSSION

I. *TIMELINESS OF APPEAL*

A. *Background*

As we have discussed, Yang filed a petition for a writ of mandamus to seek reinstatement into the UCSD Pharmacy School. On June 20, 2012, the court issued a tentative ruling denying the petition. The tentative ruling directed the University "to serve notice on all parties within 96 hours of the date of this ruling." The court heard oral argument on June 21, 2012. At the end of the hearing, the court confirmed the tentative ruling and directed the University to provide notice. That same day, the court issued a minute order adopting the same findings as the tentative ruling. The minute order also directed the University to serve notice on all parties within 96 hours.

On June 22, 2012, University served Yang with a document entitled "Notice of Entry of Ruling." The notice reads:

10

"TO PETITIONER'S COUNSEL OF RECORD:

"1. Please take notice that on June 20, 2012, the Court entered a tentative ruling attached here as Exhibit A. This tentative ruling denied the Petition for Writ of Mandate.

"2. Please take notice that on June 21, 2012, and after oral argument, the Court made final its tentative ruling."

The University attached only the tentative ruling from June 20 to the notice. The notice was filed on June 26, 2012.

On August 8, 2012, the court entered a final judgment denying the petition. On August 15, the University served Yang with a "Notice of Entry of Judgment Denying Petition for Writ of Mandate," and attached a file-stamped copy of the final judgment. Yang filed her notice of appeal on October 1, 2012.

B. *Applicable Authority*

California Rules of Court, rule 8.104, subdivision (a) (rule 8.104(a)) provides:

"(a) **Normal time** Unless a statute or rule 8.108 provides otherwise, a notice of appeal must be filed on or before the earliest of: [¶] (1) (A) 60 days after the superior court clerk serves on the party filing the notice of appeal a document entitled "Notice of Entry" of judgment or a file-stamped copy of the judgment, showing the date either was served; [¶] (B) 60 days after the party filing the notice of appeal serves or is served by a party with a document entitled "Notice of Entry" of judgment or a file-stamped copy of the judgment, accompanied by proof of service; or [¶] (C) 180 days after entry of judgment."

Subdivision (e) of this rule elaborates that "judgment" as used in subdivision (a) includes "an appealable order if the appeal is from an appealable order."

11

In *Alan v. American Honda Motor Co., Inc.*(2007) 40 Cal.4th 894 (*Alan*), the plaintiff filed a motion for class certification, which the trial court denied. (*Id.* at p. 898.) The court clerk sent a notice to each of the parties containing the following: (1) a document entitled " 'STATMENT OF DECISION RE: ALAN'S MOTION FOR CLASS CERTIFICATION,' " which explained the court's reasons for denying the motion, and had the court's file stamp; and (2) a minute order entitled " 'RULING ON SUBMITTED MATTER/MOTION FOR CLASS CERTIFICATION,' " which was not filed-stamped. (*Ibid.*)

In *Alan*, the California Supreme Court was presented with the issue of which documents satisfied rule 8,104(a)(1) so as to commence the 60-day filing period for a notice of appeal. (*Alan*, *supra*, 40 Cal.4th at p. 901.) The court held:

> "The general rule is that a statement or memorandum of decision is not appealable. [Citations.] The rule's practical justification is that courts typically embody their final rulings not in statements of decision but in orders or judgments. Reviewing courts have discretion to treat statements of decision as appealable when they must, as when a statement of decision is signed and filed and does, in fact, constitute the court's final decision on the merits. [Citations.] But a statement of decision is not treated as appealable when a formal order or judgment does follow, as in this case."

The court reasoned that because there was no document entitled " 'Notice of Entry,' " the clerk's mailing could not have triggered the 60-day filing period unless it contained a file-stamped copy of the judgment. (*Alan*, *supra*, 40 Cal.4th at p. 902.) The court noted the minute order mailed by the clerk was an appealable order, but it was not file-stamped and thus did not comply with rule 8.104(a)(1). The court observed, "courts have consistently held that the required 'document entitled " ' "Notice of Entry" ' "

12

[Citation] must bear precisely that title, and that the 'file-stamped copy of the judgment' [Citation] must truly be file stamped." (*Id.* at p. 903). The Supreme Court concluded rule 8.104(a)(1) requires a "single, self-sufficient document satisfying all of the rule's conditions . . . ." (*Id*. at p. 903.)

In *Laraway v. Pasadena Unified School Dist.* (2002) 98 Cal.App.4th 579, (*Laraway*), the trial court entered an " '*order* regarding petitioner's motion for writ of mandamus, prohibition, injunctive and declaratory relief' " on August 23, 2000. (*Id.* at p. 581.) The order completely resolved all of the issues and did not contemplate nor direct the preparation of any further order or judgment. (*Id.* at p. 582.) It was not clear whether either party was served this order until January 2001. (*Ibid.*) On January 29, 2001, the court filed its judgment on the petition, which set forth the same rulings as the initial order and included a provision that judgment was entered against the petitioner. (*Ibid.*)

There was no notice of entry on the August 23, 2000 order; thus subdivision (a)(1)(C) of rule 8.104 applied, and the last date either party could file a notice of appeal was 180 days after August 23. (*Laraway*, *supra*, 98 Cal.App.4th at p. 582.) The Court of Appeal held the August 23 order was an appealable order because "it contemplated no further action, such as the preparation of another order or judgment [Citation], and it disposed of all issues between all parties." (*Id.* at p. 583.) The court further noted, "once a judgment or appealable order has been entered, that the time to appeal can be restarted or extended by the filing of a subsequent judgment or appealable order making the same decision." (*Ibid.*) Thus, the judgment entered into on January 29 did not restart the clock for the parties' period to file a notice of appeal. (*Ibid.*)

13

In *Call v. Los Angeles County Gen. Hosp., et al.* (1978) 77 Cal.App.3d 911 (*Call*) the trial court sustained a demurrer to plaintiff's third amended complaint without leave to amend. (*Id.* at p. 914.) The defendant served plaintiff with a "Notice of Ruling" that the demurrer was sustained without leave to amend. (*Ibid.*) The clerk mailed a notice of filing of an order of dismissal to both parties. (*Ibid.*) The court ruled the defendant's notice of ruling did not commence the 60-day filing period because it was not a notice of entry of judgment; it "merely advised plaintiff that the demurrer had been sustained without leave to amend." (*Id.* at p. 915.)

C. *Analysis*

The period to file a notice of appeal begins with the earliest of two possible dates: 60 days the appealing party is served with a "Notice of Entry" of a judgment or appealable order, or 180 days after the entry of judgment. For the University to have commenced the shorter 60-day filing period, they needed to serve Yang with a document entitled "Notice of Entry" of a judgment (or appealable order), or a file-stamped copy of the judgment.

The University's "Notice of Entry of Ruling" is not a Notice of Entry of judgment. In the Superior Court's Register of Actions Notice, Respondent's notice is documented as a "Notice of Ruling." "A notice of ruling is not an order; an order is a document which contains a direction by the court that a party take or refrain from action, or that certain relief is granted or not granted . . . and which is either entered in the court's permanent minutes or signed by the judge and stamped 'filed.' " (*Shpiller v. Harry C's Redlands* (1993) 13 Cal.App.4th 1177, 1179.) Like *Call*, the University provided a notice of ruling

14

that merely advised Yang the court confirmed its tentative ruling at the hearing. The court's finalization of the tentative ruling at a hearing is not a judgment or an appealable order. It did not direct a party to take or refrain from action, nor did it grant or deny relief.

The University relies on the minute order as the appealable order that was entered after the hearing. The minute order would be an appealable order, as it specifically denies Yang's petition and resolves all the issues between the parties. However, the University was not providing notice of the minute order. The University admits in its brief that it was unaware the court had issued a formal minute order when it prepared its Notice of Entry. Thus, the University's "Notice of Entry of Ruling" was with respect to the tentative ruling and the court's finalization of it at the hearing, neither of which are judgments or appealable orders. Therefore, it was not a notice of entry of judgment as required by rule 8.104(a)(1).

Moreover, the University's reliance on *Laraway* is misplaced. First, that case does not deal with the adequacy of a notice of entry of judgment or its compliance with rule 8.104(a). Second, while, similar to *Laraway*, the judge here did enter a minute order that fully disposed of all issues, the University did not provide that minute order in its notice. There is nothing in the record or briefs that indicate whether either party served, or was served, with a notice of entry of the formal minute order. While the minute order here might have constituted an appealable order under *Laraway*, the University gave Yang no notice of entry of the minute order, or a file-stamped copy of it, that would start the 60-

15

day filing period. Thus, the minute order is subject to the 180-day filing period starting June 21, 2012, within which Yang filed her notice of appeal.

We conclude Yang's appeal is therefore timely. The University's "Notice of Entry of Ruling" was not a notice of entry of judgment as contemplated by rule 8.104(a)(1). The attached tentative ruling was not a judgment or appealable order, nor was it even file-stamped. While the minute order might have constituted an appealable order, the University did not give a notice of entry of that order, nor did it provide Yang with a file-stamped copy of that order.

## II. *MERITS*

### A. *Standard of Review*

"In a mandamus action arising under Code of Civil Procedure section 1085, judicial review is limited to an examination of the proceedings before the agency to determine whether its actions have been arbitrary or capricious, entirely lacking in evidentiary support, or whether it failed to follow proper procedures or failed to give notice as required by law. [Citations.] [¶] In determining whether evidentiary support is present in a traditional mandamus action, the applicable standard of review is the substantial evidence test. [Citations.] [¶] The court may not reweigh the evidence and must view the evidence in the light most favorable to the [agency's] actions and indulge all reasonable inferences in support thereof. [Citation.] [¶] Substantial evidence has been defined as relevant evidence that a reasonable mind might accept as adequate support for a conclusion. [Citation.] A presumption exists that an administrative action was supported by substantial evidence. [Citation.] The burden is on the appellant to show

16

there is no substantial evidence whatsoever to support the findings of the [agency]." (*Taylor Bus Services, Inc. v. San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331, 1340-1341.) "[I]f reasonable minds may disagree as to the wisdom of the agency's action, its determination must be upheld." (*Agosto v. Board ofTrustees of Grossmont-Cuyamaca College Dist.* (2010) 189 Cal.App.4th 330, 336.)

Moreover, courts rarely intervene in a university's academic affairs. (*See Paulsen v. Golden Gate Univ.* (1979) 25 Cal.3d 803, 808; *Wong v. Regents of the Univ. of Cal.* (1971) 15 Cal.App.3d 823, 830 (*Wong*).) In particular, "in actions challenging the academic decision of a private university regarding a student's qualifications for a degree, [courts] exercise a highly deferential and limited standard of review." (*Banks v. Dominican College* (1995) 35 Cal.App.4th 1545, 1551.) Courts give such deference because "[u]niversity faculties must have the widest range of discretion in making judgments as to the academic performance of students." (*Board of Curators v. Horowitz* (1978) 435 U.S. 78, 96, fn. 6.)

" '[T]he rule of judicial nonintervention in scholastic affairs is particularly applicable in the case of a medical school. A medical school must be the judge of the qualifications of its students to be granted a degree; Courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine.' " (*Wong*, *supra*, 15 Cal.App.3d at pp. 830-831, citing *Connelly v. Univ. of Vermont and State Agr. College* (1965) 244 F.Supp. 156, 160-161.)

17

B. *Analysis*

1. *Lack of PEF*

Yang asserts (1) filling out a PEF to document a student's problems is mandatory; (2) a PEF must be given to a student for any deficiency, not just a professionalism-related issue; (3) no one ever filled out a PEF for her; and (4) dismissing her for problems that should have been first identified in a PEF violates School policy and thus justifies writ relief. We reject these contentions.

Assuming that a PEF is mandatory for repeated or serious problems, it only applies to a student's deficiencies in professionalism, not academics. Indeed, the applicable policy is titled "Policy on Evaluation of *Professionalism.*" (Italics added.) The examples of improper behaviors that justify a PEF are not academic, but professional. They include such items as tardiness to clinical rotations, lack of respect for patient confidentiality or autonomy, abusing one's power with colleagues or patients, rudeness, not responding to instructor feedback, and lack of empathy for patients. The four categories identified on the PEF itself are behavioral in nature, not academic: "Reliability and Responsibility"; "Self Improvement and Adaptability"; "Relationships with Patients, Peers, Faculty and Staff"; and "Upholding the Oath of a Pharmacist and University Policies and Procedures."

Moreover, academic problems such as failing grades are not ignored by the School if no PEF is required for such deficiencies. Such problems are identified on a student's evaluation, as they were on multiple occasions in Yang's case, or discussed directly with the student. The majority of the significant problems identified by School faculty about

18

Yang were academic in nature. Thus a PEF was not required to be filled out for those types of deficiencies.

As we have discussed, *ante*, and the trial court found, the "record contains ample evidentiary support for the School's decision to dismiss [Yang] based on her academic performance alone." What prompted the Committee hearing was Yang's two failing, non-remediated grades in required APPEs. The November 2011 Committee meeting focused on "Anna Yang's academic progress from the P1-P4 years" and her "poor academic performance . . . ." While the Committee mentioned her "[c]ontinued pattern of lack of professionalism despite counseling," the primary issues identified by the Committee as "[leading] to the decision of dismissal" were Yang's academic problems, including: (1) "[a] history and pattern of poor academic performance"; including two failed classroom/didactic courses and two failed APPEs; (2) "[a] fundamental lack of clinical and medication knowledge leading to the concern for patient safety"; and (3) "gross errors" in describing "basic and extremely common drugs[.]" Moreover, Yang's formal letter of dismissal also focuses on academic problems, not professionalism.

In sum, the School dismissed Yang primarily for academic, not professionalism, reasons. Because a PEF is not meant to address academic problems, the School's failure to give Yang a PEF is of no moment.

2. *The School's alleged failure to follow it procedures*

Yang asserts that (1) the School requires two non-remediated failing grades in required courses during the same year before dismissal is possible; (2) she only had one failed grade after remediating the failed Scripps La Jolla Hospital APPE by passing the

19

Rady Children's Hospital APPE; and (3) therefore, the entire dismissal process was improper.  We reject this contention.

As we have discussed, *ante*, Yang failed two required APPEs in 2011:  an acute care rotation (at Scripps La Jolla Hospital) and an ambulatory care rotation (at the UCSD Moores Cancer Center).  She asserts that she remediated her failed acute care APPE at Scripps La Jolla Hospital by passing an acute care APPE at Rady Children's Hospital in the next academic term.   This contention is unavailing.

As the court found, under the School's grading policy, "an F grade remain[s] on the transcript."  Thus, Yang had one F on her transcript from her failed Scripps La Jolla Hospital APPE, whether or not she properly remediated her failing APPE grade.  When she also earned an F from the required UCSD Moores Cancer Center APPE in the same year, Yang became eligible for dismissal.

Yang provides no support for the proposition that "for academic purposes" her Scripps La Jolla Hospital APPE grade was erased in favor of her Rady Children's Hospital APPE grade.  The School's APPE progression policy states:  "If a student receives an F or U grade for a specific APPE, he/she will be allowed to continue their remaining, scheduled APPEs.  *Upon completion of the last scheduled APPE*, the student *will* repeat and pass the APPE where an F or U grade was received or complete and pass an equivalent APPE experience."  (Italics added.)

Thus, as the trial court found, repeating and passing a failed APPE (or completing and passing an equivalent APPE) can only occur *after all other remaining APPEs are completed.*

20

It is true that this rule is different than for classroom/didactic classes, where an F must be remediated more quickly. That is, for "Repeating Failed Coursework," the student must take and pass "the course the next time it is offered" to remediate the F. However, the School's decision to treat failing grades in APPEs differently than failing grades in classroom/didactic courses is an academic decision, and we may not intervene in that decision unless the School has acted "arbitrarily or in bad faith." (*Paulsen*, *supra*, 25 Cal.3d at p. 808; *Wong*, *supra*, 15 Cal.App.3d at p. 830.)

As we have discussed, this difference in treatment is necessary given the difficulty of scheduling APPEs. The School exercised its academic judgment to conclude that it would be disruptive to students, staff, instructors, clinical sites, and pharmacies to require immediate remediation of a failed APPE.

Yang concedes she did not complete all of her APPEs. When she was dismissed from the School, she had three more APPEs to complete. Thus, her claimed "remediation" of her failed grade in the Scripps La Jolla Hospital APPE through the Rady Children's Hospital APPE did not cure that failed grade, because it occurred before "completion of the last scheduled APPE." Accordingly, Yang still had two Fs in the same year at the time of the November 2011 Committee hearing and she was thus properly subject to dismissal.

Yang asserts that the School would not let her complete her other APPEs, but instead dismissed her prematurely, and so she had no chance to remediate. However, the APPE Progression Policy must be read in conjunction with the School's Bylaws. Pursuant to the APPE Progression Policy, the School let Yang continue taking

21

previously-scheduled APPEs even after her first F.  But under the Bylaws, once she failed her *second* APPE in the same year, she became eligible for dismissal.  The court therefore correctly found that the fact Yang "would have had an opportunity to remediate at least one failing grade after she completed the seven APPE courses does not mean she could not be dismissed."

As we have discussed, *ante*, remediation, under School policy, could only occur at the end of all scheduled clinical rotations.  The School followed its APPE-specific policy in determining whether Yang was subject to academic dismissal.  The court's denial of Yang's petition was thus based on substantial evidence.

## DISPOSITION

The judgment is affirmed.  The University shall recover its costs on appeal.

NARES, J.

WE CONCUR:

BENKE, Acting P. J.

McINTYRE, J.

22